IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| AMERICAN ALTERNATIVE INSURANCE COMPANY,<br>　*Plaintiff,*<br><br>　　　　v.<br><br>MOON NURSERIES, INC., et al,<br>　*Defendants.* | Civil Action No.: ELH-11-02267 |

**MEMORANDUM OPINION**

American Alternative Insurance Corporation ("AAIC"), plaintiff, as subrogee of Cecilton Volunteer Fire Company ("CVFC") and Volunteer Hose Company of Middletown ("VHCM"), sued defendants Moon Nurseries, Inc. and Moon Nurseries of Maryland, Inc. (collectively, "Moon")[1] under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*, to recover "response costs" in connection with a fire that erupted at Moon's premises, involving a hazardous substance (Count I).  *See* "Amended Complaint" ("Complaint," ECF 16).  Plaintiff has also lodged a negligence claim (Count II).  *Id*. Defendants have filed a "Motion To Dismiss Count I Of Plaintiff's Amended Complaint For Failure To State A Claim Upon Which Relief Can Be Granted, Or In The Alternative, For Summary Judgment" ("Motion," ECF 18), as well as a supporting memorandum ("Memo," ECF 18-1).  Plaintiff opposes the Motion ("Opposition," ECF 20), to which defendants have replied ("Reply," ECF 22).

As the matter has been fully briefed, the Court now rules pursuant to Local Rule 105.6,

---

[1] Plaintiff does not distinguish between Moon Nurseries, Inc. and Moon Nurseries of Maryland, Inc.  Defendants contend that Moon Nurseries of Maryland, Inc. "does not exist."  *See* ECF 18-1 at 8 n. 3.  At this juncture, however, this dispute is not material.

no hearing being necessary.

**Factual and Procedural Background[2]**

Defendants own Moon Nurseries, located in Chesapeake City, Maryland. Complaint ¶ 4. They characterize the property as a farm, consisting of approximately 800 acres, used to cultivate trees and shrubs. Memo at 2. The water used in Moon's irrigation system at the nursery is treated with chlorine. Complaint ¶ 7. At the relevant time, the chlorine was enclosed in cylinders and stored by Moon in a "shed." *Id.*[3] The structure also contained other mechanical and electrical equipment. *Id.* ¶ 9.

It is undisputed that chlorine is a hazardous substance within the meaning of CERCLA. *See* 40 C.F.R. § 302.4. Moreover, the structure in which the chlorine was stored constituted a "facility" under CERCLA. *See* 42 U.S.C. § 9601(9). *See* Complaint, ¶¶ 8, 10; Memo at 8, 9.

Plaintiff alleges: "Chlorine in these circumstances is not a normal and ordinary danger." Complaint ¶ 9. According to plaintiff, chlorine is "a strong oxidizing agent that poses a serious fire and explosion risk because it promotes combustion." *Id.* ¶ 19. Further, plaintiff avers that "the ignition of combustible materials near chlorine forms irritating and toxic gases." *Id.* It adds: "Containers or cylinders storing chlorine may rupture violently due to over-pressurization if exposed to fire or excessive heat for a sufficient period of time." *Id.* Nevertheless, plaintiff complains that no written warnings were posted on the shed or its immediate surroundings, alerting to the presence of chlorine. *Id.* ¶ 11. Nor had Moon disclosed to CVFC or VHCM, the

---

[2] The Court construes the alleged facts in the light most favorable to plaintiff, as the party opposing the motion. *See Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

[3] In its Memo, Moon characterizes the "shed" as a "pumphouse," 1,400 square feet in size and permanent in nature. Memo at 2.

local emergency response departments, that hazardous materials were kept on site, as it was required to do. *Id.* ¶¶ 12, 14.[4]

On August 15, 2009, a fire ignited at the facility. *Id.* ¶ 15. CVFC and VHCM, as well as other emergency response teams, responded to the scene. *Id*. Upon arrival, CVFC and VHCM personnel "observed grey and black smoke emanating from the shed." *Id*. ¶ 16. When they applied water to the structure, the smoke "turned green, and lowered to ground level." *Id*. Exposure to the green smoke made it difficult for the CVFC and VHCM personnel to breathe, and they were forced to retreat. *Id*. The Cecil County Department of Emergency Services Hazardous Materials Response Team ("Hazmat") was notified. *Id*.

Hazmat and the subrogors "observed 15 to 20 150 pound cylinders of chlorine 'off gassing' in the shed." *Id.* ¶ 18. Together with Hazmat, CVFC and VHCM demarcated "zones" around the blaze as "hot," "medium," and "cold," with the "hot zone" closest to the shed. *Id*. Hazmat instructed teams of four, known as "Recon Teams"—each with two Hazmat technicians and two fire fighters, including CVFC and VHCM personnel—to proceed into the hot zone, alternating every twenty minutes. *Id*. The Recon Teams carried a chlorine meter and an "Industrial Scientific 4 gas meter." *Id*. The chlorine meter emitted "over ranged" readings, and the gas meter gave a "reading of 4." *Id*.[5]

One of the Recon Teams entered the shed and "turned off two cylinders." *Id.* ¶ 20. A "loud hissing noise" emanated from the other cylinders, which the Recon Team attributed to heat-damaged "relief valves" on the cylinders. *Id.* The cylinders were removed from the structure and "allowed…to vent in the open." *Id*. The cylinders were then "removed to and

---

[4] CERLA is a no-fault statute; a plaintiff who proves its case may recover based on strict liability. *See* 42 U.S.C. § 9607(a).

[5] Plaintiff does not explain the significance of a reading of "over ranged" or of "4," but the context suggests that these readings indicate hazardous conditions.

stored in an area where their toxic gases would not migrate to local communities, or harm the emergency response personnel fighting the fire," with CVFC and VHCM "monitor[ing] the rate of leakage and wind direction to ensure as much." *Id.* ¶ 21. According to plaintiff, "[t]he open venting prevented a chlorine cloud from forming." *Id.* ¶ 22. It also "prevented the entire contents of the gas cylinders from leaking into the environment,[6] and the gas cylinders from exploding." *Id*. The fire was subsequently extinguished, and the defendants were advised to remove the cylinders from the premises. *Id.* ¶ 23. "In total, over 2,250 pounds of chlorine was [sic] released into the environment." *Id*.

In the course of "the above recited events," the protective gear worn by CVFC and VHCM personnel was "saturated" by chlorine gas and ruined. *Id.* ¶ 24. Plaintiff alleges that, had CVFC and VHCM "known about the presence of chlorine prior to the fire, they would have known to adorn Hazmat suits, and/or wait the arrival of individuals possessing such Hazmat suits." *Id.* ¶ 25. Moreover, they assert that the release of chlorine "made this anything but a routine fire." *Id*. ¶ 24. As insurer, plaintiff paid CVFC and VHCM $122,529.35 to "cleanup, remove, replace, and prevent, minimize and mitigate damage to the gear and to the environment." *Id.* ¶ 26.

Accordingly, plaintiff has brought suit against defendants, lodging claims of strict liability under CERCLA (Count I) and negligence (Count II). Only Count I, the CERCLA claim, is here at issue. Additional facts will be included in the Discussion.

### Discussion

*Standard of Review*

Moon has moved to dismiss the case pursuant to FED. R. CIV. P. 12(b)(6), for failure to

---

[6] It is not clear how permitting the cylinders to "vent" would prevent leakage of the "entire" contents of the cylinders.

state a claim upon which relief can be granted.  In the alternative, it has moved for summary judgment, pursuant to FED. R. CIV. P. 56.[7]

When deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court considers the complaint, as well as documents attached to it.  *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) ("We may consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic . . . ." (citation omitted)).  In considering a motion to dismiss under Rule 12(b)(6), a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (quoting *Erickson v. Pardus,* 551 U.S. 89, 94 (2007), and *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)).

Under FED. R. CIV. P. 12(d), if "matters outside the pleadings are presented to and not excluded by the court" in connection with a Rule 12(b)(6) motion, "the motion must be treated as one for summary judgment under Rule 56." *Trimble Navigation,* 484 F.3d at 705.  As the parties have not asked me to consider any matters outside the pleadings, I will construe the Motion as a motion to dismiss.

Under FED. R. CIV. P. 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56 n.3 (2007) (citation omitted).  To be sure, the plaintiff need not include "detailed factual allegations in order to satisfy" Rule 8(a)(2). *Id.* at 555.  But,

---

[7] Defendants have not submitted any exhibits with their Motion.

the rule demands more than bald accusations or mere speculation. *Id*. To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id*. at 556. A complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient under the Rule. *Id.* at 555.

A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6). *German v. Fox*, 267 F. App'x 231, 233 (4th Cir. 2008). Both *Twombly*, 550 U.S. 544, and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), make clear that, in order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 129 S. Ct. at 1953 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions'. . ." (citation omitted)); *see Simmons v. United Mortgage and Loan Inv.*, 634 F.3d 754, 768 (4th Cir. 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

However, in resolving a Rule 12(b)(6) motion, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S. Ct. 1740 (2010). Moreover, a motion pursuant to Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted). But, if the "well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct," the complaint has not shown that "'the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1950 (citation omitted).

*Analysis*

CERCLA is an environmental statute commonly known as the "Superfund." *Westfarm Assocs. Ltd. P'ship v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 673 (4th Cir. 1995). It was "designed to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination," known as "potentially responsible persons" ("PRPs"). *Burlington N. and Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 129 S.Ct. 1870, 1874 (2009) (citation omitted). One of CERCLA's provisions, 42 U.S.C. § 9605, provides for a "national contingency plan," which "specifies procedures for preparing and responding to contaminations." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 161 n.2 (2004). "[A] private party that ha[s] incurred response costs, but [has] done so voluntarily and was not itself subject to suit, ha[s] a cause of action for cost recovery against other PRPs." *Id.* at 161.

Plaintiff asserts that its subrogors, CVFC and VHCM, "removed" and "remediated" the chlorine at defendants' premises, within the meaning of CERCLA. Complaint ¶¶ 31-36. According to plaintiff, in the process of the subrogors' "removal" and "remediation," the subrogors sustained damages, i.e., the destruction of the protective gear. *Id.* ¶¶ 37-39. In plaintiff's view, these damages constitute "response costs" necessarily incurred "consistent with the national contingency plan," within the meaning of CERCLA. *Id.* ¶ 40. Therefore, AAIC maintains that it is entitled to recover those costs from Moon, pursuant to 42 U.S.C. § 9607(a), which states that "the owner and operator of a vessel or a facility" shall be liable for "necessary

costs of response incurred by any other person consistent with the national contingency plan." *Id*. ¶¶ 47-49.

I.

Moon urges the Court to dismiss Count I because "the Amended Complaint fails to plead facts to show that the Plaintiff[] [is] entitled to recovery under CERCLA." Motion ¶ 4. Moon concedes that "a cursory perusal" of the Complaint contains "all the necessary buzz words…." Memo at 8. But, it insists that plaintiff has not "pled any facts indicating that [the subrogors] undertook a 'remediation' or 'removal' as defined in CERCLA, nor that they incurred 'response costs' as defined in that statute." Motion ¶ 3. Noting that the subrogors were "responding to a fire," and not "embarking upon an environmental cleanup," Memo at 10, defendants posit: "[E]xtinguishing a structure fire in the vicinity of stored chlorine, and dragging some of the chlorine tanks away from the flames, simply does not qualify as a comprehensive environmental cleanup necessary for recovery under [CERCLA]." Motion ¶ 6.

In defendants' view, the subrogors' actions qualify "only as 'routine firefighting,' which is expressly exempted and excluded from recovery under [CERCLA]." *Id*. Moreover, Moon notes that, in permitting "the chlorine to keep leaking," or "vent," as plaintiff describes it, the subrogors "expressly controvert[ed] the statute," and failed to undertake "an actual cleanup or preventative program." *Id.* ¶ 7. Defendants ask rhetorically: "[H]ow can plaintiffs…claim that this unexpected, unprepared, and unlucky exposure to chlorine constituted a CERCLA cleanup?" Memo at 11. They add that, because plaintiffs "did not even know there was chlorine present," *id*. at 12, their damages "could not possibly have been related to any 'remediation' or 'removal' of chlorine as required by CERCLA." *Id*.

Further, defendants contend that even if plaintiff had "properly alleged a removal [or] remediation…[it] nevertheless alleged no facts indicating that any costs [it] incurred could qualify as 'Response Costs' under CERCLA." Memo at 23. Moon insists that the alleged damages do not qualify as "costs recoverable" because they were not "necessary" and are thus not consistent with the national contingency plan, *id.* at 25; they are merely costs plaintiff "would normally incur by providing emergency responses," *id.* at 27; they were incurred in "routine firefighting," *id.* at 29; and are mere property damage not recoverable under the statute. *Id.* at 34. In Moon's view, public policy also dictates against recovery. *Id.* at 35.

In its Opposition, plaintiff maintains that it has adequately "pled response." Opposition at 6. It contends that the actions taken by CVFC and VHCM with respect to the chlorine in fighting the fire—turning off two cylinders, removing approximately twenty others from the structure to prevent an explosion, monitoring the leakage as the canisters continued to "vent," and preventing migration of the hazardous substance to surrounding communities—constituted removal and remediation. Plaintiff also asserts that the subrogors "stored and confined" the cylinders "while the fire was being fought," *id.* at 11, and conducted an "investigation" in ascertaining the cause of the green cloud. *Id.* at 9. Urging a broad construction of CERCLA, in light of the statutory goals, plaintiff argues that its response actions "need not constitute a permanent remedy," and that short-term clean up measures can qualify as removals entitled to recovery under CERCLA. Opposition at 12. Plaintiff also insists that "[p]ublic policy encourages CERCLA recovery in this case," *id.* at 24, as the point of the statute is to ensure that "'polluters…pay for their pollution.'" *Id.* (citation omitted).

Plaintiff primarily relies on two cases to support its position. In the first, *Colorado v. Sunoco, Inc.*, 337 F.3d 1233 (10th Cir. 2003), the Tenth Circuit held that the plugging of a

9

"ditch" that had been discharging water contaminated with toxic metals constituted a removal action. According to plaintiff, "Turning off the valves in this case is just like plugging the ditch in *Colorado*." Opposition at 10. In plaintiff's view, this Court "should follow the Tenth Circuit, and find that a remediation, and thus a response, has been pled," so as to warrant the denial of the Motion. Opposition at 10-11.

The second case is *U.S. v. Hooker Chemical & Plastics Corp.*, 607 F. Supp. 1052, 1068 (W.D.N.Y. 1985). Plaintiff asserts that the *Hooker* Court "held that there was a response under CERCLA when a party 'prevent[ed] the off-site migration of chemicals' from a landfill, and instituted a program to contain and collect the chemicals for future incineration or disposal." Opposition at 13. Thus, plaintiff concludes that the actions of CVFC and VHCM amounted to a "response under CERCLA" because, in turning off the cylinders, the subrogors "prevented the off-site migration of chlorine." *Id.* In addition, plaintiff maintains that, because the canisters "presumably were eventually removed from the site by the Defendants or their agents," the subrogors "contained and collected the chlorine for future disposal." *Id*.

Plaintiff also challenges defendants' arguments regarding the validity of its claimed response costs. Opposition at 14. Plaintiff disputes defendants' contention that property damage is not recoverable under CERCLA, *id.* at 15, and that its costs were not necessary. *Id.* at 16. In its view, the "claimed damages are the exact type of allowable costs contemplated by CERCLA." *Id*. at 19.

As to defendants' argument that the subrogors' actions constituted "routine firefighting," which is exempt from recovery under CERCLA, plaintiff points to the allegations in the Complaint, at ¶ 24: "The absence of a warning about the presence of the chlorine, the undiscoverability of the chlorine, and the eventual release of the chlorine made this anything but

a routine fire."  Plaintiff concludes: "A fire that is not routine must require fire fighting that is not routine."  Opposition at 19-20.

## II.

Based on the facts alleged by plaintiff, I am satisfied that CVFC and VHCM did not "respond," in that their conduct did not amount to "remediation" or "removal" within the meaning of CERCLA.  My reasons follow.

Sections 9607(a)(1) and (a)(4)(B) of 42 U.S.C. provide that "the owner and operator of…a facility…from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance shall be liable for…necessary costs of response incurred by any other person…."  Under 42 U.S.C. § 9601(25), "[t]he terms 'respond' or 'response' means[] remove, removal, remedy, and remedial action…."

CERCLA defines "remedy" or remedial action" as "those actions consistent with *permanent remedy*…in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment."  42 U.S.C. § 9601(24) (emphasis added).  The statute provides a non-exhaustive list of examples of remedial actions, which includes, *id*.:

> [S]uch actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.  The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure

> disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.
>
> CERCLA defines "removal" as follows:
>
> [T]he cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

*See* 42 U.S.C. § 9601(23). The statute provides a non-exhaustive list of examples of removal actions, including "security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title,[8] and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act." *Id*.

Under the plain language of the statute, CVFC and VHCM undertook no remedial action. CVFC and VHCM concede that they permitted the canisters to "vent" into the open air, which is a far cry from preventing or minimizing the release of hazardous substances. Complaint ¶ 20. Indeed, "over 2,250 pounds of chlorine was [sic] released into the environment." *Id*. ¶ 23. Plaintiff's averments indicate that the subrogors abandoned the cylinders, and Moon was "advised to have the chlorine cylinders removed from the premises." *Id*. *See also* Opposition at 13 ("[T]he chlorine canisters presumably were eventually removed from the site by the Defendants or their agents."). Clearly, the subrogors' actions did not constitute a "permanent remedy" with respect to the storage of chlorine.

---

[8] 42 U.S.C. § 9604(b) governs "[i]nvestigations, monitoring, coordination, etc. by [the] President."

Although plaintiff's Complaint and the Opposition are replete with the use of the "buzz words" of "stored" and "confined," this is a mere "formulaic recitation" of 42 U.S.C. § 9601(24), excerpted above. *Twombly,* 550 U.S. at 555.  Temporarily moving the cylinders from the shed to another area of the farm and watching them for a few hours is "storage" and "confinement" in the most hollow sense.  Plaintiff's subrogors vented rather than stopped the release of chlorine; they did not treat the chlorine to neutralize it or make it safer; did not relocate any residents or businesses; and they did not remove the hazardous substance from the site of the fire to store, treat, or dispose of it.  As defendants contend, "turning off two gas canisters, dragging twenty canisters outside of the burning building and into a field…, watching them leak downwind, putting out the remaining fire, then leaving the premises forever, hardly satisfies the comprehensive long-term and permanent cleanup requirements of a 'remediation' under CERCLA." Memo at 18.

Similarly, under the plain language of CERCLA, neither CVFC nor VHCM undertook any removal action.  Plaintiff alleges that, in addition to turning off two cylinders, twenty were removed from the burning shed.  Complaint ¶ 21.  Thereafter, CVFC and VHCM monitored "the rate of leakage and wind direction" to protect local structures.  *Id*.  That is the extent of their actions, according to their own allegations.  The subrogors did not "cleanup" or "remove" hazardous substances from the environment or dispose of the removed material.  Rather, they left the canisters behind, which "presumably were eventually removed from the site by the Defendants or their agents." Opposition at 13.  They did nothing to limit access to the hazardous substance once the fire was extinguished, nor did they evacuate any threatened individuals.

Although plaintiff's subrogors did "monitor…the release…of hazardous substances" by checking "the rate of leakage and wind direction," that is not distinct from the subrogors'

ordinary duties as firefighters. Indeed, as defendants assert, firefighters "commonly monitor wind direction and wind speed in order to determine if flames or smoke will spread to nearby structures." Memo at 21. And, fires commonly involve the release or emission of fumes and smoke that could pose a danger to public health and the environment.

To the extent that plaintiff avers that the subrogors conducted an "investigation" in ascertaining the cause of the green cloud, this is again a mere "formulaic recitation" of 42 U.S.C. § 9601(23), excerpted above. *Twombly,* 550 U.S. at 555. Hazmat conducted the inspection "with the assistance of subrogors," which consisted of entering the shed, observing the "hissing noise," and turning off and removing the cylinders. Complaint ¶¶ 18, 20.[9]

It is true that "removal efforts" are "typically short-term cleanup arrangements." *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040 (2nd Cir. 1985). *See also City of New York v. Exxon Corp.*, 633 F. Supp. 609, 614 (S.D.N.Y. 1986) ("In short, 'removal' actions are primarily those intended for the short-term abatement of toxic waste hazards, while 'remedial' actions are typically those intended to restore long-term environmental quality"). But, plaintiff has not cited any CERCLA cases, nor am I aware of any, finding that actions comparable to those of the subrogors amounted to removal. To the contrary, the lead cases cited by plaintiff, *Colorado*, *supra,* 337 F.3d 1233, and *Hooker*, *supra*, 607 F. Supp. 1052, make clear that CERCLA cases typically involve large-scale, long-term, targeted environmental projects. As defendants note: "[A]lthough [AAIC] contend[s] that removal actions can be short-lived, every

---

[9] Plaintiff cites *HRW Systems, Inc. v. Washington Gas Light Co.*, 823 F. Supp. 318, 345 (D. Md. 1993), for the proposition that "*any* investigation which could lead to the discovery of hazardous substances at a site…could be considered 'necessary' in order to accomplish the goals of [CERCLA]" (emphasis in original). Yet, in that case, the court was not asked whether the investigation at issue constituted a "response" under CERCLA. Rather, the court responded to, and ultimately rejected, the argument "that any site investigation conducted…was not a *necessary* response cost because it was performed 'to further [p]laintiffs' litigation interests.'" *Id.* at 342.

case cited by [AAIC] involved a CERCLA removal or remediation that lasted years or decades, not minutes." Memo at 10.

*Colorado* is not factually analogous. Although plaintiff contends that the removal action of "plugging the ditch" undertaken in that case is comparable to "[t]urning off the valves in this case," I disagree. Opposition at 10. The "ditch" in *Colorado* was a vast gold mine, and the "plugging" required months of work to complete; it was extremely costly; and it was undertaken as part of a multi-faceted approach to an environmental disaster that had been placed on the national priorities list. Furthermore, whether such actions constituted a response within the meaning of CERCLA was not at issue in *Colorado*. Rather, the court considered whether the response constituted a removal action or a remedial action for the purposes of applying statutes of limitation.

As to *Hooker*, the relevant portion of that case is more accurately characterized as standing for the proposition that "CERCLA does not prohibit containment as a means of dealing with inactive landfills." 607 F. Supp. at 1068. The subrogors' conduct of turning off the cylinders and leaving them on-site, under the apparent assumption that they would later be disposed of, is not analogous to the containment of the vast, leeching landfill at issue in *Hooker*.

Moreover, *Hooker* addressed claims brought under the Safe Drinking Water Act; the Resource Conservation and Recovery Act; the Clean Water Act; and the Rivers and Harbors Act, as well as a public nuisance claim, *id.* at 1055, but not CERCLA. As the *Hooker* Court observed, *id.* at 1068 n.14: "It should be noted that this case does not contain a CERCLA claim. The court's discussion on this point is solely for the purpose of dispelling the Province's notion that the remedy in this case is inconsistent with an important environmental statute." Thus, the court was not asked to rule on whether the action was a "remedy" or "removal" within the

meaning of CERCLA. Rather, it considered whether a proposed action plan would constitute an appropriate remedy as part of a settlement agreement that required court approval.

Notably, CERCLA "allows only for recovery of costs actually incurred in cleaning up a hazardous waste site." *Carroll v. Litton Sys., Inc.*, No. 88–253, 1990 WL 312969, *61 (W.D.N.C. Oct. 29, 1990). It "is not to be used…as a universal solution to all ills that originate from a hazardous waste site." *Ambrogi v. Gould, Inc.*, 750 F. Supp. 1233, 1248 (M.D. Pa. 1990). Of import here, "Congress did not intend CERCLA to be utilized as a means to recover 'economic loss' for civil damages that a private party may seek as part of a toxic tort action….Thus, the purpose of the legislation would preclude recovery of costs for matters which did not facilitate the prompt, thorough, and cost-effective cleanup of a hazardous waste site." *Id*. Similarly, in *Artesian Water Co. v. Government of New Castle County*, 659 F. Supp. 1269, 1299-1300 (D. Del. 1987), the court explained: "Congress did not intend for CERCLA, a narrowly drawn federal remedy, to make injured parties whole or to be a general vehicle for toxic tort actions. Unless Congress sees fit to provide such a remedy, full compensation for hazardous waste harms will in most instances remain the province of state law."

Put simply, plaintiff's subrogors simply did not clean up a hazardous waste site. In the course of fighting a fire, they moved cylinders containing a hazardous substance from an area of Moon's facility where they were at risk of ignition, to an area of Moon's facility where they were not; once removed from the shed, the hazardous substance in the cylinders was vented into the environment; and the cylinders were ultimately left behind at defendants' property. Because

plaintiffs have failed to plead either remediation or removal within the meaning of CERCLA, the analysis ends there. Memo at 24.[10]

This Opinion is not intended to diminish the contributions of the courageous firefighters who fought the blaze for Moon. They clearly performed a valuable public service. Yet, any losses they and, by extension, their insurer sustained simply are not recoverable through an action under CERCLA.

## Conclusion

For the foregoing reasons, the Court will grant defendants Moon Nurseries, Inc. and Moon Nurseries of Maryland, Inc.'s motion to dismiss Count I of the Complaint. A separate Order consistent with this Opinion follows.

Date: March 14, 2012                                    /s/
                                                        Ellen Lipton Hollander
                                                        United States District Judge

---

[10] As the actions undertaken by CVFC and VHCM did not amount to a "remediation" and/or "removal" within the meaning of CERCLA, I need not determine whether plaintiff's expenditures properly qualify as "response costs," or whether recovery would be precluded by the "routine firefighting" exemption.